Filed 6/2/22  P. v. Perry CA5
Opinion following transfer from Supreme Court

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DESMOND JEROME PERRY,<br><br>    Defendant and Appellant. | F079881<br><br>(Super. Ct. No. BF173254A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

This matter is before us for reconsideration following the California Supreme Court's recent decision in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). As discussed below, we shall remand for resentencing in accordance with *Tirado*.

## PROCEDURAL HISTORY

Defendant Desmond Jerome Perry was charged with two counts of willful, deliberate and premediated murder with a multiple-victims special circumstance (counts 1 and 2), and one count of shooting at an occupied dwelling (count 3). (Pen. Code, §§ 187, subd. (a), 189, subd. (a), 190.2, subd. (a)(3), 246.)[1] The jury convicted defendant of two counts of murder, but found the attached premeditation allegations not true. The jury also convicted defendant of shooting at an occupied dwelling and on all three counts, found true that defendant personally and intentionally discharged a firearm causing great bodily injury (GBI) or death. (§ 12022.53, subd. (d).)[2] On counts 1 and 2, the trial court sentenced defendant to two consecutive terms of 15 years to life for second degree murder plus an additional 25 years to life for the firearm enhancement, for a total indeterminate term of 80 years to life. On count 3, the trial court sentenced defendant to the lower term of three years plus an additional term of 25 years to life for the firearm enhancement, stayed under former section 654.[3]

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] Assembly Bill No. 1171 made technical changes to section 12022.53, effective January 1, 2022, as a result of separate substantive changes to the crime of spousal rape. (Legis. Counsel's Dig., Assem. Bill No. 1171 (2021–2022 Reg. Sess.) Stats. 2021 ch. 626, § 65, pp. 101–103.) The changes made do not affect our analysis in this case.

[3] At the time of sentencing, section 654, former subdivision (a), provided, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *shall be punished under the provision that provides for the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision." (Italics added.) As amended by Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1) effective January 1, 2022, section 654, subdivision (a), now provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Given defendant's entitlement to resentencing under

On appeal, defendant advanced several claims related to sentencing. He argued that trial counsel rendered ineffective assistance of counsel when counsel failed to request that the trial court exercise its discretion to substitute a lesser uncharged firearm enhancement under section 12022.53 in lieu of the greater enhancement found true by the jury. Relatedly, defendant argued that he was entitled to remand so the trial court could exercise its discretion to substitute a lesser enhancement and that the trial court abused its discretion when it declined his request to strike the firearm enhancement under former section 1385.[4] Finally, he argued that the trial court abused its discretion in imposing consecutive sentences on counts 1 and 2.

The People disputed defendant's entitlement to relief.

In our nonpublished opinion, *People v. Perry* (Dec. 22, 2021, F079881) 2021 Cal.App. Unpub. Lexis 8075 (*Perry I*), we found no errors and affirmed the judgment.[5] The California Supreme Court granted review in *Perry I* and transferred the matter back to us with directions to vacate our opinion and reconsider the cause in light of the decision in *Tirado, supra*, 12 Cal.5th 688. We do so now.

Supplemental briefing is complete, and the parties disagree whether defendant is entitled to remand for resentencing under *Tirado*. We conclude that he is entitled to relief, and we remand the matter for resentencing in accordance with *Tirado*.

---

*Tirado*, the parties and the trial court may address defendant's sentence under section 654 as amended on remand. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673–674.)

[4] Effective January 1, 2022, section 1385 was amended by Senate Bill No. 81 (2021–2022 Reg. Sess.) Statutes 2021, chapter 721, section 1 (Senate Bill 81). Given the necessity of resentencing under *Tirado*, the parties and the trial court may address defendant's sentence under section 1385 as amended on remand. (*People v. Sek, supra*, 74 Cal.App.5th at p. 674.)

[5] Defendant argued that if we found his challenges to the trial court's exercise of its sentencing discretion forfeited for failure to object, trial counsel rendered ineffective assistance of counsel. It was unnecessary to reach this claim in *Perry I* and we do not reach it on reconsideration under *Tirado*. (*People v. McDaniel* (2021) 12 Cal.5th 97, 129.)

# FACTUAL SUMMARY

There was no dispute at trial that Michael Wiggins and his 12-year-old niece, Trinity Wiggins, were shot and killed by defendant on July 22, 2018.[6] Wiggins, who was in a long-term relationship with defendant's cousin, T., was the intended target, but defendant claimed he fired in self-defense after Wiggins pointed a gun at him. Trinity was not a target and defendant was not aware of her presence, but she was struck and killed by one of the bullets that pierced the exterior wall of the house.

## I. Prosecution Evidence

### A. Background

At the time of the shooting, Wiggins, T., and their three young children lived with Wiggins's brother, D., at D.'s house in California City. D.'s father-in-law and brother-in-law, V. and V.S., Jr., also lived at the house, and the four children D. shared with his estranged wife, including Trinity, visited often.

Wiggins and T. had been together for six or seven years, and they moved in with D. approximately six months before the shooting. T. testified that Wiggins was never abusive toward their three children, but, during the first half of their relationship, he physically abused her. During the three years leading up to the crime, although there was no physical abuse, the couple argued often and T. said Wiggins would threaten her. T. testified that Wiggins did not follow through on his threats, but, in statements, she said he had a bad temper, did not back away from conflict, was paranoid and controlling, did not like her talking to other men, and would not allow her to leave.

In contrast, D. testified he never witnessed any physical abuse between Wiggins and T. and never saw Wiggins try to control T. However, he worked and was not at home with them during the day. D. said the couple bickered occasionally, which he

---

[6] Because the victims share a last name, we will refer to Trinity by her first name. No disrespect is intended.

found "funny" and "hilarious," his testimony suggesting that the disagreements resolved quickly and were not serious. D. described Wiggins as calm and nonviolent, and he said T. did not seem afraid of Wiggins, she left the house with the children whenever she wanted, and she would not have listened to Wiggins had he tried to control her. Neither Wiggins nor T. had a vehicle, but D. testified he had seen T. threaten to leave before and, one time, he saw her pack up and leave with the children via Uber. D. said Wiggins was not unusually upset when T. left, and she returned home the next day.

T. and defendant met as children and had very sporadic contact over the years, falling in and out of touch with one another. Approximately one month before the shooting, T. reconnected again with defendant through Facebook. At the time, defendant lived in Acton, approximately 45 minutes to one hour away from California City. They did not see one another in person during this period, but communicated several times a day through Facebook Messenger. In the past, T. told defendant that Wiggins was "gang-related," and, when they reconnected, T. told defendant that she and Wiggins were having trouble and she wanted to leave. She mentioned going to a shelter, but defendant, who lived in an apartment with his girlfriend and their young daughter at the time, did not want her to do so, and he offered to let her and her children stay with him until she could get on her feet. T. told defendant that Wiggins was beating her up and had threatened to burn the house down. T. testified she was afraid of Wiggins, but she trusted defendant, whom she thought was calm enough to handle defendant without trouble arising.

### B.     The Shooting

On the day of the shooting, T. was messaging with defendant. T. testified she was feeling unsafe and at 6:09 p.m., she messaged defendant about going to a shelter. Defendant rejected that idea, and he asked where she was and what was happening. T. responded she was at home and said, "'BD is losing his mind,'" referring to Wiggins as "[b]aby daddy." Defendant asked her what Wiggins was doing and where she lived. T. provided the address and responded, "'Saying he's going to set the house on fire with me

5.

and the kids in it.'" Defendant told T. he was going to come and get her. When defendant told T. he was on his way, she messaged, "'Cuzzo, don't do nothing to get you in trouble.'"

At trial, T. explained she sent that warning because she was worried Wiggins, who was larger, might hurt defendant. However, she also testified that Wiggins was aware she and defendant were messaging each other and he "was okay with it." Wiggins had not taken any steps to carry out his alleged threat to burn the house down, and when defendant asked T. if Wiggins had touched her, she told him no.

At approximately 7:30 p.m., defendant messaged T. that he was there. She walked outside, hugged him, and told him she would be back with her stuff. Defendant was alone and standing at the end of the walkway. T. testified the children were playing inside and Wiggins was on their bed in the living room. Wiggins did not say anything to her, and she did not tell him where she was going. She went into a room in the back of the house and began packing items to go.

T. testified that she heard Wiggins and defendant talking outside, heard defendant tell Wiggins to go back inside, and then heard multiple gunshots. She said she did not see Wiggins go outside and did not see defendant with a gun. After hearing the shots, she was in shock and screamed. She saw Wiggins in the hallway lying down with a gunshot wound to his chest. He did not say anything to her and, when she looked outside, defendant was gone and no one else was around.

D. was not home when the shooting occurred, but V. and his son were in their room. V. did not hear anything preceding the shooting and did not know where the shots were coming from, so he told his son to exit the house through the window in their room. V. then opened the door and saw Wiggins staggering down the hall. Wiggins was bleeding and T. was behind him screaming hysterically. Wiggins slid down the wall and told V. to call 911, which he did. V. heard T. saying something like "'Desmond,'" and,

6.

in T.'s testimony, she identified her voice in the background of the 911 call saying, "'It was Desmond.'"

The police station was nearby and officers arrived quickly. Trinity was inside the house on the floor, killed by a bullet that entered her right shoulder and traveled left through her chest. Wiggins was in the hallway with a single gunshot wound and was still conscious. He was able to provide his name and told police "'her cousin'" shot him before he started fading into unconsciousness.

Wiggins was transported to the hospital, where he died from his injury. He had methamphetamine; benzoylecgonine, a metabolite of cocaine; and THC, the active ingredient in marijuana, in his system when he died. However, D. had never seen Wiggins use drugs, T. did not see him use drugs that day, and police did not find any drugs or drug paraphernalia in the house.

At the scene, T. told Officer Hulse defendant was texting her and Hulse took her phone. Defendant had asked if Wiggins was okay and if the police were there. Hulse responded from T.'s phone, "'I'm scared. What should I do?'" Defendant responded that "'one of his friends got into it, right,'" and Hulse texted back, "'I don't know what you are talking about. Where are you?'" Defendant responded, "'the 15. I'm hide in Vegas.'" After more texting back and forth, defendant texted, "'It was two. He shot from the car. He is going to San Fran. I told him to shoot if he pulled a gun.'"

T. gave multiple statements to law enforcement. Officer Hulse testified that T. said she saw defendant pull his gun first and she saw Wiggins point a pellet gun at defendant. Officer Hansen testified that T. stated she heard Wiggins tell the children to go inside, and she heard Wiggins and defendant begin arguing. When she looked outside, she saw defendant grab a large black weapon from the trunk of his car, heard four or five shots, saw Wiggins struggling inside, and saw defendant put his gun back in the car and drive off. She also told Hansen there was possibly a black male driving the car and defendant was possibly the passenger. At trial, T. denied making those

7.

statements and maintained she did not see either man with a gun and did not see defendant leave.

## C.    Other Evidence

Officers located five shell casings at the scene and four bullet holes in the front of the house in a pattern that suggested the shooter was moving while firing.  Three of the bullets went through the exterior wall into the home.  Although the murder weapon was never located, there was no dispute at trial that defendant used his legally purchased and owned Smith & Wesson M&P Sport, an AR-15-type semiautomatic rifle.  Officers also located a pellet gun just inside the front door of D.'s house.  It lacked any markings to identify it as a pellet gun, and Officer Hulse conceded it could be mistaken for a real gun "in the heat of the moment."

On August 1, 2018, defendant's car was found abandoned in the desert off a dirt road after a county employee working in the area saw it and called it in.  The same day, based on his cell phone location, defendant was tracked down at the Lancaster apartment of a coworker and arrested.

T. later wrote Wiggins's and Trinity's family an apology letter.  In the letter, she asked for forgiveness and stated she knew they were angry, but she was not at fault and was also "'hurting just as much ….'"  She said defendant was only supposed to pick her up and he "'made the decision … on his own to shoot [Wiggins].'"  She also wrote, "'You guys know how Junior is,'" referring to Wiggins, and "'I told him Junior was angry and he was making threats towards me and the boys.  I also told him that I wasn't in any danger.'"  However, none of her messages with defendant reflected that she told him things had calmed down and, on cross-examination, she conceded she did not tell him she was no longer in danger or to go back home.

## II. Defense Evidence

### A. Character Evidence

Defendant's mother, his girlfriend with whom he lived and shared a young daughter, and one of his coworkers testified to defendant's character. All three described defendant as even tempered and honest, and stated he was not aggressive or confrontational. Defendant was a full-time city bus driver in Los Angeles, and his coworker testified it was a daily challenge dealing with people, but defendant had a good reputation with other drivers, and he was always bubbly and helpful.

### B. Defendant's Girlfriend's Testimony

Defendant's girlfriend was at home with defendant the day of the shooting. She testified that when he left their apartment that evening, he was concerned about his cousin, but not angry or upset. He owned a firearm that used to be kept in the closet, but was more recently kept in the trunk of his car. Defendant did not come home or call her after he left the apartment that day and he did not respond to her text messages. She testified that when deputies searched their apartment two days after the shooting, she told them defendant's gun was not in the apartment anymore because of their daughter. She denied she told police he had it with him for protection from T.'s boyfriend.

### C. Defendant's Testimony

Defendant also testified. He and T. did not maintain consistent contact, but they reconnected periodically. Several years before the shooting, T. told him Wiggins was "'gang-related'" after he went to pick her up and some "really aggressive" men came out of the house to question him.

Approximately three weeks before the shooting, they reconnected through Facebook and T. told him via Facebook Messenger that Wiggins was threatening her and the kids. Defendant testified that T. also said Wiggins pointed "'a big ass gun'" at them and she mentioned going to a shelter. Defendant did not want T. to go to a shelter and he told her she could come to his house. On the day of the shooting, she messaged

9.

defendant that Wiggins had threatened to burn down the house with her and the kids in it. Defendant was concerned and worried, but he did not call police because he had the impression from their conversations that T. did not want the police involved.

Defendant owned an unmodified semiautomatic firearm he purchased from a licensed dealer six or seven years before the shooting. He also owned three 10-round magazines, one of which was loaded, and he kept everything in a gun bag. Defendant testified he initially bought the gun for personal protection, but only used it for target practice at a gun range. He had moved the unloaded firearm and magazines from a shelf in his closet to the trunk of his car about a year earlier, after his daughter grew curious and attempted to reach the shelf with a stool.

Defendant went to pick T. up that evening. He got out of the car after he arrived, opened the trunk, and moved stuff around to make room for T.'s bags. He spotted his firearm in the trunk at that time. T. came out and greeted him and then said she was going to get her belongings. Defendant did not see any children, but he knew T. and Wiggins had three children and he saw a man's head through the front door when T. re-entered the house.

As defendant waited between the rear passenger door and the trunk, two of T.'s and Wiggins's children came out of the house and he said hi to them. Wiggins then came out and told the children to go back in the house. He did not appear upset or angry to defendant, but he asked defendant, "'What's up?'" Defendant responded that he was taking T. and the kids with him, and Wiggins appeared shocked. Wiggins told defendant that he was not going to take the kids and T, and defendant responded that it was T.'s choice, not his or Wiggins's.

Wiggins seemed upset, but was not yelling. He stated defendant was "not gonna fucking take the kids and [T.]" Defendant told Wiggins he was just there to pick up his cousin and was not there to argue or fight, but Wiggins stated, "'Shut the fuck up. I'll beat your ass.'" Defendant told Wiggins to go back inside the house, and Wiggins

10.

repeated the threat and told defendant he was going to kill defendant and T. Defendant again told Wiggins to go back inside the house. Wiggins repeated his threats and moved toward defendant aggressively. Afraid, defendant then grabbed his rifle from the trunk, but did not point it at Wiggins. He told Wiggins to leave him alone and go back in the house.

Wiggins smirked and defendant realized the orange gun lock was on the weapon. Defendant removed the lock, and Wiggins "stormed" into the house after telling defendant, "'Yeah, you're not going nowhere.'" As defendant went to retrieve his cell phone from his car, Wiggins reappeared carrying what defendant said looked like a large rifle. Defendant testified that Wiggins was manipulating the gun and he moved to the trunk as fast as he could, grabbed a magazine and loaded his rifle. Wiggins was then pointing his weapon from the doorway of the house. As defendant prepared to fire, Wiggins pulled the gun back through the doorway. Wiggins stuck the gun out of the door again after manipulating it. Defendant testified he thought Wiggins was loading the gun and that it was real, so when Wiggins pointed it at him the second time, he fired five shots as he ran.

Defendant stated he was only trying to hit Wiggins and did not know Trinity was in the house. After Wiggins retreated into the house, defendant jumped in his car and drove off. He testified he was terrified and had never shot at anyone before. He just kept driving down dirt roads until eventually his car got stuck in the desert sand and he was unable to free it. He texted T. to ask if everyone was okay and if she had called the police. After she responded and asked what she should do, his fear increased and he made up a story about someone else shooting. He then called a coworker he dated briefly in the past during a period of separation from his girlfriend and she picked him up. He testified he threw his gun in the dirt near the car and left it there.

Defendant said he learned two people died in the shooting when someone from his work posted a news article about it to a Facebook group chat. At one point between the

shooting and his arrest, he went to Texas with his coworker, but they later returned to California and he was arrested at her apartment.

### D. Officer Hulse's Testimony

Officer Hulse testified that defendant's car was recovered on August 1, 2018. It was found in the desert approximately 20 minutes from the scene of the shooting, near a county building. The location was still within city limits, but was off a dirt road and officers needed 4x4 off-road vehicles to access the area.

## III. Rebuttal Evidence

Officer Hulse testified that 10 to 15 officers spent all day searching the desert around defendant's car, but never found the firearm. However, there was a pond by the county building, approximately 100 to 150 yards from the car, and it was surrounded by so much vegetation that they could not search it. Hulse also testified that on the day of defendant's arrest, he did not turn himself in right away. Instead, he did so that night after law enforcement waited outside his coworker's apartment all day.

Hulse testified that on the day they searched defendant's apartment, defendant's girlfriend texted him to turn himself in, but he never responded to her. During her interview, which was not recorded, she said defendant usually kept his gun in the closet. She did not know why it was not in the apartment, but said he might have taken it for protection. She also did not know who defendant would need protection from, but said maybe his cousin's boyfriend.

## DISCUSSION

## I. Imposition of Firearm Enhancements

As to all three counts, the prosecutor alleged defendant personally and intentionally discharged a firearm proximately causing GBI or death, in violation of section 12022.53, subdivision (d). The jury found the sentence enhancement allegations true, resulting in imposition of additional, consecutive sentences of 25 years to life. The trial court had the discretion to strike or dismiss the enhancement in the interest of justice

under section 1385 as then in effect, but it declined to do so. (§§ 12022.53, subd. (h), 1385, former subd. (a).)

Based on the then-existing split in the Courts of Appeal regarding whether the trial court had the discretion to impose a lesser uncharged enhancement in lieu of the greater enhancement found true by the jury, defendant advanced two related claims in *Perry I*. He argued that the trial court abused its discretion when it failed to substitute a lesser enhancement under section 12022.53 and trial counsel's failure to request the substitution constituted ineffective assistance of counsel. He also argued that the trial court's denial of his motion to strike the firearm enhancement pursuant to former section 1385 was an abuse of discretion. We rejected these arguments in *Perry I*. We now conclude that defendant is entitled to remand for resentencing on counts 1 and 2 under *Tirado*, but we again reject the claim that the trial court abused its discretion when it declined to strike the firearm enhancement under former section 1385.

## A. Entitlement to Remand Under *Tirado*

Defendant was sentenced on August 23, 2019. Approximately four months earlier, the First District Court of Appeal considered whether the trial court had discretion to impose a lesser enhancement under section 12022.53 that had not been found true by the jury. (*People v. Morrison* (2019) 34 Cal.App.5th 217, 220 (*Morrison*).) *Morrison* concluded that because "the court may impose a 'lesser included' enhancement that was not charged in the information when a greater enhancement found true by the trier of fact is either legally inapplicable or unsupported by sufficient evidence" (*id.* at p. 222), the trial court also has the discretion under section 1385 to strike the greater enhancement under section 12022.53, subdivision (d) and impose a lesser enhancement under subdivision (b) or (c) of section 12022.53, notwithstanding that the jury did not make findings as to those enhancements (*Morrison, supra*, at pp. 222–223).

One and one-half weeks before sentencing, this court addressed the same issue and declined to follow *Morrison*. (*People v. Tirado* (2019) 38 Cal.App.5th 637, 644,

13.

reversed by *Tirado, supra*, 12 Cal.5th at p. 702.)  In *People v. Tirado*, we interpreted section 12022.53, subdivision (h), and section 1385, and concluded that the Legislature did not "grant the trial court the power to modify or reduce a firearm enhancement .…" (*People v. Tirado, supra*, at p. 643.)

The California Supreme Court subsequently concluded *Morrison* was correctly decided and reversed our decision in *People v. Tirado*.  (*Tirado, supra*, 12 Cal.5th at pp. 697 & 702.)  The high court explained, "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53[, subdivision ](d) enhancement, and the court determines that the section 12022.53[, subdivision ](d) enhancement should be struck or dismissed under section 12022.53[, subdivision ](h), the court may, under section 12022.53[, subdivision ](j), impose an enhancement under section 12022.53[, subdivisions ](b) or (c)."  (*Id.* at p. 700, fn. omitted.)  The court cautioned, "however, that this general rule only applies when a true finding under section 12022.53[, subdivision ](d) necessarily includes a true finding under section 12022.53[, subdivisions ](b) or (c).  That would not be the case if a section 12022.53[, subdivision ](d) enhancement were added to a charge under section 246 [shooting at an inhabited dwelling house] or under subdivisions (c) or (d) of section 26100 [shooting from a motor vehicle].  Those offenses are not 'specified in subdivision (a),' as required for imposition of an enhancement under section 12022.53[, subdivisions ](b) or (c). (§ 12022.53[subds. ](b), (c).)"  (*Ibid.,* fn. 12.)

In this case, the general rule articulated in *Tirado* is applicable to counts 1 and 2, as murder is one of the offenses specified in subdivision (a) of section 12022.53. Therefore, as to counts 1 and 2, the trial court has the authority to strike the enhancements under subdivision (d) of section 12022.53 and impose enhancements under subdivision (b) or (c) of section 12022.53.  (*Tirado*, *supra*, 12 Cal.5th at p. 700.)

Notwithstanding the recent decision in *Tirado*, the People maintain that defendant is not entitled to reversal for resentencing because the record does not affirmatively

14.

demonstrate error and defendant fails to show prejudice. We are not persuaded by these arguments.

We stated in *Perry I* that "we presume both the trial court and trial counsel were aware of the split of authority (*People v. Jones* (2017) 3 Cal.5th 583, 616; *People v. Blackburn* (2015) 61 Cal.4th 1113, 1123–1124), and any claimed ""error must be affirmatively shown"" (*People v. Giordano* (2007) 42 Cal.4th 644, 666)." (*Perry I, supra*, 2021 Cal.App. Unpub. Lexis 8075, *21.) However, our statement should not be divorced from the context in which it was made. Courts "exercising inferior jurisdiction can and must make a choice between the conflicting decisions" (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456), but "[a]s a practical matter, a superior court ordinarily will follow an appellate opinion emanating from its own district even though it is not bound to do so" (*McCallum v. McCallum* (1987) 190 Cal.App.3d 308, 315–316, fn. 4). Central to our rejection of defendant's claim in *Perry I* was our decision in *People v. Tirado*, which declined to follow *Morrison*.

We explained in *Perry I*, "[T]he trial court lacked the discretion to substitute a lesser enhancement under section 12022.53 where the jury only considered and found true the enhancement alleged under subdivision (d) of section 12022.53. This forecloses defendant's claim that the trial court erred when it failed to impose, or consider imposing, a lesser enhancement under section 12022.53. [¶] It also forecloses defendant's claim that trial counsel rendered ineffective assistance of counsel." (*Perry I, supra*, 2021 Cal.App. Unpub. Lexis 8075, *21–22.) "'Counsel is not ineffective for failing to make frivolous or futile motions.' ([*People v. Thompson* (2010) 49 Cal.4th 79, 122]; accord, *People v. Bell* (2019) 7 Cal.5th 70, 126–127.) Accordingly, given the holding in [*People v.*] *Tirado* [38 Cal.App.5th 637], trial counsel did not commit error by failing to ask the trial court to exercise discretion that it did not possess." (*Id.* at *22.)

"'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of

the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; accord, *Tirado, supra*, 12 Cal.5th at p. 694; *People v. Flores* (2020) 9 Cal.5th 371, 431–432.) Given the silent record in this case and, critically, the overruling of our district's decision in *People v. Tirado*, it is appropriate to remand the matter to allow the trial court to consider whether to strike the section 12022.53, subdivision (d) enhancements attached to counts 1 and 2 and substitute enhancements under subdivision (b) or subdivision (c) of section 12022.53. (See *People v. McDavid* (2022) 77 Cal.App.5th 763, 772–774 [entitlement to retrospective application of *Tirado* in nonfinal cases].)

The People's prejudice argument, which is tethered to defendant's claim of ineffective assistance of counsel, does not persuade us otherwise. Nothing in the record clearly indicates that remand would be an idle act in this case and, therefore, remand for resentencing under *Tirado* is the appropriate disposition. (*People v. Gutierrez, supra*, 58 Cal.4th at p. 1391.)

**B.      Denial of Section 1385 Motion to Strike Firearm Enhancements**

However, we again reject defendant's claim that the trial court abused its discretion when it denied his motion to strike the firearm enhancements under former section 1385 as the law then stood. As stated in footnote 4, section 1385 was amended effective January 1, 2022, by Senate Bill No. 81. The parties and the trial court may address the amendment of section 1385 on remand.

16.

### 1.      Standard of Review

"'[A] court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is' reviewable for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 373.)  "In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."'  [Citations.]  Second, a '"decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"'  [Citations.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376–377.)

### 2.      Analysis

Section 12022.53 provides for "escalating additional and consecutive penalties, beyond that imposed for the substantive crime, for use of a firearm in the commission of specified felonies" (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124), subject to the trial court's ability to exercise its discretion to strike or dismiss the enhancement under section 1385 (§ 12022.53, subd. (h)).  Section 1385 permits the enhancement to be stricken or dismissed if the trial court determines it is "in furtherance of justice," and the reasons underlying the exercise of such discretion must be stated on the record.  (§ 1385, subds. (a), (b).)

At sentencing, trial counsel made an oral motion requesting the court strike the firearm enhancements given that defendant did not have a prior criminal history, there was "at least some semblance of self-defense or conflict" between defendant and Wiggins, and defendant did not intend Trinity's death.  The court declined, noting that

17.

the jury rejected defendant's claim of self-defense and he used an assault rifle. The court also noted the enormity of the family's loss.

Defendant argued that "[c]onsideration of all the circumstances does not support imposition of the enhancement, rendering the court's refusal to strike the enhancements arbitrary and unreasonable." At bottom is defendant's disagreement with imposition of the enhancements, and his claim is founded on the proposition that because the trial court determined it was not in the furtherance of justice to strike the enhancements and declined to exercise its discretion to do so, it abused its discretion. We disagree.

The felony sentencing rules relied on by defendant apply in cases involving determinate sentences (Cal. Rules of Court, rules 4.401, 4.403),[7] or indeterminate sentences "imposed under section 1168[, subdivision ](b) only if [the sentence] is imposed relative to other offenses with determinate terms or enhancements" (rule 4.403). In this case, defendant was sentenced to indeterminate terms, but his claim fails in any event.

The rules provide that "the court may consider the effect that striking the enhancement would have on the status of the crime as a strike, the accurate reflection of the defendant's criminal conduct on his or her record, the effect it may have on the award of custody credits, and any other relevant consideration." (Rule 4.428(b).)[8] Factors in aggravation and mitigation include any that "reasonably relate to the defendant or the circumstances under which the crime was committed." (Rules 4.421(c), 4.423(c).) "Relevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects

---

[7]     Further references to rules are to the California Rules of Court.

[8]     Effective March 14, 2022, the Judicial Council amended the Advisory Committee Comment to rule 4.421 and amended rules 4.406, 4.423 and 4.428. Those amendments do not relate to the subdivisions relied on herein, with the exception of (b)(8) of rule 4.406 cited in *Perry I*, which has been renumbered to (b)(7).

otherwise." (Rule 4.409.) Relevant to this specific claim, a trial court is required to give a reason for its sentencing choice only when it *grants* relief under section 1385. (§ 1385, subd. (a); rule 4.406(b)(7).)

There is no showing that the court misunderstood the scope of its discretion or imposed a sentence that was unauthorized. Rather, the linchpin in defendant's argument was that the court stated there were no aggravating circumstances and did not discuss any mitigating factors beyond his lack of a criminal record, although additional factors in mitigation existed.

As defendant points out, mitigating circumstances under the rules include that "[t]he victim was an initiator of, willing participant in, or aggressor or provoker of the incident" (rule 4.423(a)(2)), and that "[t]he crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur" (*id.*, (a)(3)). However, nothing in the record suggests the trial court felt bound by the jury's rejection of defendant's self-defense claim or that it otherwise disregarded the issue. Rather, the court noted that it accepted the jury's verdict, but also stated, "To an extent the defense is now trying to convince this Court that there was a semblance of self-defense which arose to a conflict between the victim and the defendant, and based on the evidence presented, it does not appear to the Court of such."

It is the jury's duty to weigh the evidence and assess the credibility of the witnesses in reaching the verdict, but the trial court, as well, exercises its sentencing discretion through the lens of the evidence adduced at trial. Although defendant disagrees with the court's decision, he identifies nothing in the record that shows the court's exercise of discretion exceeded the bounds of reason. There was conflicting evidence regarding who initiated the armed confrontation, and T. told Officers Hulse and Hansen that it was defendant who pointed a gun first. The court's view of the facts, therefore, is not only supported by evidence adduced at trial, but that evidence undermines the mitigating factors relied on by defendant in support of his argument.

Furthermore, although the trial court found no aggravating factors, the facts in this case could have easily supported a contrary finding. (See *People v. Brooks* (2017) 3 Cal.5th 1, 39 [""""[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.""""].) Defendant fired five shots at the occupied dwelling. While defendant was only aiming for Wiggins and did not know Trinity was inside, he nevertheless fired at the house with a high-powered weapon knowing, at a minimum, that T. and her three young children were inside. (Rule 4.421(a)(1) ["crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness"], *id.*, (b)(1) ["defendant has engaged in violent conduct that indicates a serious danger to society"].)

As stated, the trial court is presumed to have properly exercised its sentencing discretion and defendant bears the burden of showing error. (*People v. Carmony, supra*, 33 Cal.4th at pp. 376–377.) Neither a defendant's nor a reviewing court's mere disagreement with the ruling will suffice as grounds to set it aside. (*Id.* at p. 377.) The facts of this case are unusual and tragic in that defendant did not have a prior criminal record and was a contributing member of society, there was no indication he was an aggressive person, and he drove to California City planning only to help his cousin and her three young children leave what he believed to be, and what may have been, an abusive situation. However, defendant fired multiple rounds from a high-powered rifle at a house, killing two people, one of them a child, and in declining to strike the firearm enhancements, the trial court acted well within the bounds of its broad sentencing discretion. (*Ibid.*)

Therefore, we reject defendant's claim of error. The trial court might make different sentencing choices on remand in light of *Tirado* and Senate Bill No. 81's amendment of section 1385, but it did not abuse its discretion when it declined to strike the enhancements under section 1385 as the law stood in 2019.

## II. Imposition of Consecutive Sentences

Finally, defendant claimed the trial court abused its discretion in imposing consecutive sentences. Although he acknowledged the existence of multiple victims can support imposition of consecutive sentences, he argues that "[c]onsidering the absence of aggravating factors, imposition of concurrent sentences was the only reasonable choice." We again reject this claim.

The trial court had broad discretion to impose consecutive sentences (§ 669; *People v. Shaw* (2004) 122 Cal.App.4th 453, 458), and it was not required to state its reasons for selecting consecutive indeterminate terms (*People v. Arviso* (1988) 201 Cal.App.3d 1055, 1058, superseded by rule on another ground as stated in *People v. Calhoun* (2007) 40 Cal.4th 398, 407–408, fn. 6; see § 1170, subd. (c) [statement of reasons for selecting determinate sentencing choice required]; rule 4.403 [rules apply to determinate sentencing]). Nevertheless, even when the law requires a reason be stated, the existence of one aggravating factor suffices (*People v. Davis* (1995) 10 Cal.4th 463, 552; accord, *People v. Leon* (2010) 181 Cal.App.4th 452, 468–469), and the court may properly rely on the fact that the offenses were committed against multiple victims (*People v. Shaw, supra*, at pp. 458–459; accord, *People v. Leon, supra*, at p. 468).

As discussed *ante*, there was evidence to support a finding of additional aggravating factors, but even in the absence of such evidence, the trial court had the discretion to impose consecutive indeterminate terms based solely on the fact that the shooting killed two people. (*People v. Shaw, supra*, 122 Cal.App.4th at pp. 458–459; *People v. Leon, supra*, 181 Cal.App.4th at p. 468.) Therefore, the record does not support defendant's claim of error.

## DISPOSITION

The matter is remanded for resentencing.  The judgment is otherwise affirmed.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


DeSANTOS, J.